**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| **v.** | * | **CRIMINAL NOs. JKB-13-084** |
| | * | **JKB-13-0102** |
| **TYSON HINCKLE, et.al.,** | * | |
| **ROBERT HARVEY, et.al.,** | * | |
| | * | |
| **Defendants.** | * | |
| | * | |
| | ******* | |

<u>GOVERNMENT'S RESPONSE TO DEFENDANTS' MOTIONS TO
DISMISS INDICTMENT OR FOR A *KASTIGAR* HEARING</u>

The United States of America, by and through its undersigned counsel, hereby responds

to defendants Robert Harvey and Keith Morris' Motion to Dismiss the Indictment and/or to

Exclude Tainted Witnesses and to defendants Tyson Hinckle, Edwin Stigile, Josh Hummer,

Reginald Martin, and Michael Morgan's Motion for a Hearing Pursuant to *Kastigar v. United*

*States*.[1]  The government respectfully requests that the Court deny both motions as each are

premised upon mistaken assumptions about the circumstances surrounding the statements and

testimony given by the defendants, the "use" the government made of various statements given

by the defendants, and the existence of independent sources of the information contained in the

---

[1] The government is filing one response to the defendants' motions regarding arguably compelled statements.  This Response discusses the relevant circumstances surrounding the making of the defendants' various statements, but does not, in this publically filed brief, discuss the *content* of any of their statements. The government separately submits, *ex parte* and under seal, supplemental material for each individual defendant; this supplemental information has not been seen by any member of the trial team.  The government has previously filed a Motion for Protective Order Restricting the Use and Dissemination of Certain Statements, (Doc. 20) which is relevant to the information in the supplemental brief and attachments.  The government requests that the Court make a determination as to the conditions under which the supplemental information should be disseminated.

statements given by the defendants.  The government recognizes that the defendants have not seen the statements in question; they are part of the sealed filing, subject to conditions of disclosure set by the Court.

Defendants Harvey and Morris argue that the charges against them should be dismissed because the defendants were compelled to give statements to administrative investigators, and these statements were later used to direct the state investigation.  The defendants also assume that investigators exposed witnesses to the content of these compelled statements.  Defendants Hinckle, Stigile, Hummer, Morgan, and Martin echo these arguments, and also claim that even post-*Miranda* statements given by the defendants were compelled for purposes of this analysis. The defendants' arguments are premised upon *Garrity v. New Jersey*, 385 U.S. 493 (1967), in which the Supreme Court held that an incriminating statement made by a police officer is inadmissible against the officer in a criminal trial if the officer made the statement under the threat that he would lose his job if he invoked his right to remain silent.  The Court concluded that, under those circumstances, the statement was coerced because the officer was denied any meaningful opportunity to assert his Fifth Amendment rights.  See id. at 499-500.  The flaw in the defendants' arguments is that they ignore the fact that the protection outlined in *Garrity* extends only to those statements that are truly compelled under threat of job loss, and not to every statement an officer makes during an administrative investigation or hearing.

The defendants allege that the government impermissibly used three categories of statements to build a case against them:  (1) statements made to investigators from the Department of Public Safety and Correctional Services Internal Investigation Unit (IIU); (2) statements made to Maryland State Police (MSP) detectives and IIU investigators during joint

interviews; and (3) statements made during administrative hearings relating to appeals of termination.  They further contend that defendants' compelled statements were disclosed to witnesses during the administrative and criminal investigations.  As explained in Part II(A) of this brief, it is only statements made to IIU investigators or during some of the IIU/MSP joint interviews that were *arguably* compelled, and it is only those statements falling within these categories which prosecutors may be prohibited from using against some of the defendants.  All of the defendants have failed to meet their burden to prove any of the other statements were compelled.

Furthermore, the statements made by the defendants to IIU were *not* used against them.  As explained in Part II(B) of this brief, the government employed a "filter team" that painstakingly reviewed the file to ensure that the prosecution team was never exposed to any arguably compelled statement, or to any reference to such.  Through this method, the government guaranteed that, as a practical matter, no compelled statement could be used against any defendant.  Not only did such a process prohibit direct use but it also prevented the government from using such statements to refresh witness recollection or pursue any leads from the evidence.  Additionally, in an abundance of caution, the filter team even screened from the trial team the statements in the third category listed above, those made during the administrative appeals, even though case law firmly establishes that those statements were not in fact compelled.  Use of the filter team ensured that no member of the trial team ever read, heard, or learned of the content of any arguably compelled statement.

In addition to denying the motion to dismiss the indictment or exclude witnesses, this Court should also deny the defendants' request for an evidentiary hearing.  It is true that, once a

3

court has determined that a compelled statement was made, it sometimes conducts a hearing to

determine whether the government has met its burden of showing that any evidence used to build

a criminal case against the defendants came not from their compelled statements, but from

independent sources.  Here, however, there is no need for such procedures because the Court

may, itself, compare information contained in the compelled statement to information in the

various non-compelled statements made by the defendants and others.  (The government has

appended sealed supplemental materials to facilitate this review).  If the Court determines that

the information in the initial IIU statements was compelled (and therefore unavailable for the

government to use), but materially duplicates information available in the non-compelled

statements (which the government was free to use), then this Court may comfortably conclude

that even if the government *had* made use of the compelled statements (which the government of

course denies) then any use of such statements would have been patently harmless.  Moreover,

even if the Court were to determine that there was not an independent source for each and every

compelled material statement, the Court could, without holding a hearing, credit the

government's representations, set forth in the attached Declaration, *See* Exh. 1 (Declaration of

Attorney Ahmad), that its use of a filter team prevented the trial team from using any of the

defendants' compelled statements.

I.      <u>Facts</u>

A.  <u>Procedural background</u>

On February 26, 2013, a federal grand jury returned a seven-count indictment against

defendants Hinckle, Morgan, Martin, Stigile, and Hummer, all of whom were officers or

supervisors working the day (7 a.m. – 3 p.m.) shift at RCI.  The charges in the Indictment stem

from the violation of the civil rights of inmate K.D. and obstructive actions afterward aimed at hindering the ensuing investigation.  On March 5, 2013, a federal grand jury returned a two-count indictment charging that defendants Harvey and Morris, while working the evening (3 p.m. – 11 p.m.) shift at RCI, violated the civil rights of K.D. and that defendant Harvey falsified a report concerning K.D.

   More specifically, it is alleged that inmate K.D. had assaulted a Correctional Officer, T.M., and was placed in a segregation unit during the evening shift on March 8, 2008.  Defendants Harvey and Morris assaulted him in his cell, causing bodily injury.  During the next day shift on March 9, 2008, defendants Hinckle, Morgan, Martin, and Stigile learned of the assault on their fellow officer and conspired to retaliate against K.D.  Hinckle, Morgan, and Martin entered K.D.'s cell and kicked and punched K.D. in the head and body, causing bodily injury. Defendant Hummer was aware of the assault and resulting injuries but did not act to intervene during the assault or to provide necessary medical care following the assault.  After the assaults, Harvey made material omissions in reports provided to investigators.  Hinckle, Stigile, Morgan, Martin, and Hummer conspired to cover up the assault and took steps to do so by destroying surveillance videos, failing to write required use of force reports, lying to state and federal investigators, and testifying falsely in administrative proceedings.

   On March 29, 2013, the government filed a Motion for Protective Order relating to statements made by the defendants during the administrative and state investigations, in order to prevent the dissemination to all parties of statements that are arguably protected under *Garrity*. On May 10, 2013, defendants Harvey and Morris filed a motion opposing a protective order, and also moved to dismiss the Indictment against them and/or to exclude tainted witnesses.  On

May 15, 2013, defendants Hinckle, Stigile, Hummer, Martin, and Morgan filed a motion for a *Kastigar* hearing.

B. Statements made by defendants Harvey, Morris, Hinckle, Stigile, Hummer, Martin, and Morgan

The assaults on K.D. occurred on March 8-9, 2008.  On March 9, IIU investigator Detective Sergeant Mark Forrest began a criminal and administrative investigation; on March 17, he was joined by MSP Corporal Rick Bachtell, who took over the criminal investigation, while Sgt. Forrest continued with the administrative investigation.  With the exception of Harvey's first interview, which was initiated by Harvey, Sgt. Forrest provided to RCI management the names of employees he wanted to interview and those people were sent to a conference room at RCI and, after the MSP joined the investigation, were told to report to MSP barracks.  There were no threats of discipline made if the witness did not go speak with investigators, whether in RCI or at the barracks.

Sergeant Forrest and Corporal Bachtell conducted their interviews together, and during these interviews, the witnesses were told that while they had to speak with Sgt. Forrest because he was conducting an administrative investigation, they did not have to speak with Cpl. Bachtell, who was conducting a criminal investigation.  Numerous witnesses, including several of the defendants, waived their *Miranda* rights during the course of the criminal investigation and spoke with Cpl. Bachtell.  *See* Exh. 2 (Miranda waiver forms signed by Harvey, Henson, Hinckle, Martin, Morgan).

Of the defendants, only Harvey, Morris, and Hinckle were interviewed by IIU prior to MSP joining the investigation.  With the exception of Morris, all of the defendants were interviewed

by IIU and MSP jointly after the MSP began its investigation.  Hinckle, Morris, Hummer, Morgan, and Martin testified in administrative proceedings in which they had a Fifth Amendment right not to testify.

Defendant Harvey initiated his first interview with Sgt. Forrest.  Several days later, Harvey was again interviewed by Sgt. Forrest.  During this interview, Harvey waived his *Miranda* rights.  Harvey did not testify in any administrative proceedings.

After Morris' initial interview with IIU, he was not re-interviewed.  He chose to testify in his own defense at his administrative hearing.

Hinckle was first interviewed by IIU on March 9.  On March 17, he was interviewed, as a witness, by IIU and MSP jointly.  During that interview, Sgt. Forrest stated that they were there at Hinckle's request.  Hinckle denied that he had requested the interview, but continued the interview with both investigators even after the difference between the criminal and administrative investigations was explained to him.  On March 27, IIU and MSP told him they had video evidence contradicting his prior statements; with this knowledge, he waived his *Miranda* rights and was interviewed a third time.  Hinckle was also called by Michael Morgan to testify in Morgan's administrative hearing.  Hinckle appealed his own termination but did not testify on his own behalf.

Defendant Stigile was interviewed by IIU and MSP on April 8, 2008.

Defendant Hummer was interviewed twice by IIU and MSP.  He was called by state authorities to testify in two administrative hearings, including those involving Michael Morgan and Tyson Hinckle's appeals.  Finally, he was called by Tyson Hinckle to testify in Hinckle's state criminal trial.

Defendant Morgan was interviewed by IIU and MSP, waiving his *Miranda* rights.  He later chose to appeal his termination and testified on his own behalf at that administrative hearing.

Defendant Reginald Martin was interviewed by IIU and MSP, also waiving his *Miranda* rights.  He was later called to testify by Michael Morgan in Morgan's administrative hearing.

## II.     Law and Argument

To determine whether the defendant is entitled to relief, this Court must engage in a two–part analysis.  First, it must determine, with respect to each statement, whether the defendants have met their burden of demonstrating that their statements were compelled under the Fifth Amendment.  *See Kastigar v. United States*, 406 U.S. 441, 460 (1972) (noting that before the government proves independent source, a defendant must demonstrate that he was compelled to testify under grant of immunity ); *United States v. Koon*, 34 F.3d 1416, 1431 (9th Cir. 1994), *sentencing rev'd on other grounds Koon v. United States*, 518 U.S. 81 (1996); *see also United States v. Martin*, 332 F.3d 827, 833 (5th Cir. 2003) (rejecting a *Kastigar* argument because the defendant failed to meet his burden of showing he had made compelled statements).  Second, the Court must determine, with respect to any statement that was, in fact, compelled, whether the government has demonstrated by a preponderance of the evidence that it did not use those compelled statements against the defendant.  *Koon*, 34 F.3d at 1431.

To assist the Court in the first step, the government sets forth, in Part A, below, the legal standard for determining when a statement is compelled under *Garrity*.  Applying this law to the circumstances of this case, the government explains why none of the statements made by the defendants, whether made to IIU investigators, MSP/IIU investigators acting together, or during administrative or court proceedings were compelled statements warranting *Garrity* protection.

8

To assist the Court in the second step of the *Kastigar/Garrity* analysis, the government will assume, only for purposes of this response, that the statements were compelled and set forth the legal standard for determining whether a compelled statement has been used against a defendant. Part B explains the procedures used to ensure that the prosecution team was not exposed to any alleged compelled statements, thereby preventing "use" of any alleged compelled statements by federal prosecutors. The government also submits supplemental materials under seal containing a chart for each defendant, showing some of the independent sources that exist for the alleged compelled statements.  Finally, in Part C, the government explains why the defendants are currently entitled to neither dismissal nor a hearing on their *Garrity* motions.

A.   Of the Statements Made by Defendants, None of Those Made to the Internal Investigations Unit Were Compelled

The Self Incrimination Clause of the Fifth Amendment states that no person "shall be compelled in any criminal case to be a witness against himself."  U.S. Const. Amend. V, Cl. 2. The right applies not only to an individual's criminal trial but also "privileges him not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings." *Lefkowitz v. Turley*, 414 U.S. 70, 77 (1973).  However, the Fifth Amendment prevents only "compulsion" of testimony. *See Minnesota v. Murphy*, 465 U.S. 420, 427 (1984); *United States v. Monia*, 317 U.S. 424, 427 (1943).  It "does not preclude a witness from testifying voluntarily in matters which may incriminate him." *Murphy*, 465 U.S. at 427 (internal quotations and alterations omitted); *see also United States v. Jenkins*, 785 F.2d 1387, 1393 (9th Cir. 1986) (explaining *Murphy*).

In most instances, if a witness wants to invoke the protection of the Fifth Amendment privilege, he must affirmatively claim it. *See Murphy*, 465 U.S. at 427.  Thus, a witness who

answers questions put to him without asserting the right to remain silent usually forfeits the privilege. *See id*. In *Murphy*, a probationer was required to meet with his probation officer and be truthful in all matters. After learning that Murphy had admitted, during a counseling session, to the rape and murder of a teenage girl, his probation officer arranged a meeting with him and asked about the murder. Murphy admitted to the crime and his statements were later used against him in a murder trial. The Supreme Court ruled that the requirement that Murphy meet with his probation officer and answer questions truthfully was no different than the requirements of any witness subpoenaed to testify before a grand jury or at trial. If Murphy wanted to avail himself of his Fifth Amendment privilege, he had to affirmatively assert it. *Id.* at 421, 427.

The Supreme Court has also held that a state cannot impose substantial penalties because a witness elects to assert his Fifth Amendment privilege. *Id.* at 435, *citing Lefkowitz v. Cunningham,* 431 U.S. 801, 805 (1977). The specific type of penalty at issue here is the threat of job loss. In *Garrity*, the Supreme Court recognized that it is coercive to force a public employee to choose between surrendering his job and surrendering his Fifth Amendment right to remain silent. *See Garrity*, 385 U.S. at 496-97. In *Garrity*, the penalty for remaining silent was explicitly and starkly laid out. Police officers accused of fixing traffic tickets were told, prior to being interviewed, that they had the Fifth Amendment right to remain silent, but if they exercised that right, they could be terminated from their jobs. *Id.* Subsequent cases have recognized that the threat of penalty need not be explicitly stated as long as the surrounding circumstances cause a witness to reasonably believe that he will be penalized for remaining silent. *See United States v. Vangates*, 287 F.3d 1315, 1321-22 (11th Cir. 2002). That is, an officer's subjective belief that he was compelled to give a statement under threat of job loss must be objectively reasonable at

the time the statement was made.  *United States v. Friedrick*, 842 F.3d 382, 395 (D.C. Cir.

1988); *see also, Dwan v. City of Boston*, 329 F. 3d 275, 279 (1st Cir. 2003) (noting that a

statement is not coerced where the employee was not threatened or forewarned of any sanction

for refusing to testify, even where the employee suffers adverse action after-the-fact); *Vangates*,

287 F.3d at 1324 (finding that, where a correctional officer was subpoenaed by a private attorney

to testify in a civil trial; there was no statute, regulation or policy requiring her to forgo her Fifth

Amendment rights in this situation; and her employer did not order her to testify and tell her that

she would be subject to sanctions if she did not, her belief that her testimony was compelled was

not objectively reasonable).

        The question confronting this Court is whether any statements made by the defendants

were, in fact, obtained through the threat to inflict substantial penalties unless they forfeited their

right to remain silent.  This determination requires a factual analysis of the circumstances

surrounding the statements.  *See United States v. Indorato*, 628 F.2d 711, 717 (1st Cir. 1980)

(finding no violation of Fifth Amendment right against self-incrimination where officer, upon

questioning by two supervisors, did not assert his privilege against self-incrimination; was not

told he would be dismissed if he did not answer questions; was not asked to sign a waiver of

immunity; and there was no statute mandating dismissal for his refusal to answer questions.)

        Application of these general principles to each category of statement made by the

defendants in this case clearly shows that none of the defendants' statements were compelled.

        *1.  Harvey's Statement to IIU on March 9, 2008*

        On March 9, 2008, Sergeant Forrest learned that a corrections officer had been assaulted

by K.D., and that K.D. had also been assaulted.  Forrest traveled to the hospital where K.D. was

being treated, but K.D. refused to provide him with any information about what had happened to cause his obvious injuries. Sergeant Forrest then went to RCI, where he faced the task of completing three investigations: one criminal investigation with K.D. as the subject for assaulting an officer; one criminal investigation with K.D. as the victim; and one administrative investigation into the assault on K.D. With virtually no information to go on, Sgt. Forrest began talking to staff members, including three nurses and the officer who had been assaulted by K.D. Less than an hour and a half after Forrest began talking to people at RCI, defendant Harvey, who used to supervise Forrest, approached Forrest while Forrest was in the office of an RCI supervisor discussing the investigation. Harvey began talking to him about what had happened, and Forrest then interviewed him. This interview was initiated by Harvey, not by any order or request that Harvey speak with Forrest or cooperate with the IIU investigation. Therefore, there is no support for the assertion that it was compelled, and Harvey's statements on March 9, 2008, are not entitled to any protection under *Garrity*.

### 2. *Hinckle and Morris' Statements to IIU on March 9, 2008*

Defendants Hinckle and Morris were also interviewed during this first round of interviews on March 9. Neither of these statements was compelled. *Garrity* warnings were not given, and the rules in place at the time stated only that officers "shall" cooperate with an IIU investigation, but did not state any penalty for not doing so.[2] Sergeant Forrest did not tell the defendants that if they did not speak to him they would face disciplinary action and he has said that he did not compel any of these interviews. Further, Sgt. Forrest would not have the

---

[2] In 2008, internal investigations were governed by the DPSCS' Standards of Conduct and Internal Administrative Disciplinary Process. Exh. 3. These regulations describe numerous penalties for violations that fall short of termination, including Written Counseling, Training, Referral to an Employee Assistance Program, Issuance of a Written Reprimand, and Suspension. Nothing in the regulations states that the penalty for declining to speak to IIU investigators is dismissal.

authority to discipline an officer.  If an officer refused to speak with him, Forrest would have to notify the officer's supervisor, who would then determine further action.  *See* Exh.1 at ¶ 39. Additionally, several officers who were interviewed by Sgt. Forrest have stated that they thought they had to talk to Forrest, but did not think they would get fired if they did not, nor did anyone tell them that they would be disciplined if they refused to be interviewed. *See id.* at ¶ 38 (noting that witnesses Harris, Kelly, Kirby, Lohr, Mellott and Steele all indicated they were never told or never thought that they would be fired if they declined to speak with IIU).

There has been no showing by the defendants of any circumstances that would have placed them in the untenable position of having to choose between their jobs and their Fifth Amendment privilege against self-incrimination.  Nor is there evidence that the defendants' belief that they would be fired if they did not give a statement to IIU was an objectively reasonable one, given the lack of statute or policy linking refusal to talk to IIU with job loss and the fact that several other officers did not believe failure to cooperate would lead to job loss. Absent such a showing, there are no grounds to support a finding that these statements were compelled.  *See United States v. Trevino*, 215 Fed.Appx. 319, 322 (5th Cir. 2007) (statement given by officer who was taken to interview by supervisor and was told the investigator "needs to talk to you" was not compelled where officer was not threatened with negative consequences if he failed to comply).

### *3. Stigile and Hummer's Statements to IIU and MSP*

Defendant Hummer was interviewed on April 3 and April 7, 2008.  Stigile was interviewed on April 8, 2008.   Based on reports from other witnesses, it is likely that the defendants were told to report to the MSP barracks for administrative interviews.  The interviews

took place at the MSP barracks, with Sgt. Forrest and MSP Cpl. Bachtell conducting the interviews.  As stated in the Declaration accompanying this response, Sgt. Forrest has stated that during every joint IIU/MSP interview, the witness was informed that there were both administrative and criminal investigations being done and that if they did not wish to speak to Cpl. Bachtell regarding the criminal investigation, Bachtell would leave the room.  Although the witnesses were told that they needed to speak with Sgt. Forrest, they were not threatened with disciplinary action if they did not.  In addition, according to Hummer's statements to federal investigators, after his April 3 interview, Hummer contacted Cpl. Bachtell and asked to meet with him again.  Therefore, as with Hinckle and Morris, there has been no showing that Stigile or Hummer's statements were compelled within the meaning of *Garrity* and they are, therefore, not protected.

### 4.  *Hinckle, Martin and Morgan's Statements to IIU and MSP*

As noted above, Hinckle was interviewed by IIU and MSP jointly on March 17 and 27, 2008.  Martin and Morgan were each interviewed one time by IIU and MSP, on April 3 and April 4, 2008, respectively.  For all three defendants, after the explanation by Sgt. Forrest of the difference between the IIU and MSP investigations, the defendants executed *Miranda* waivers, agreeing to speak with both Sgt. Forrest and Cpl. Bachtell.  The defendants' motion asserts, without explanation, that they were "compelled" to sign the *Miranda* waiver.  There is simply no evidence to support such an assertion.  The defendants were told there was a criminal investigation being conducted, they were advised of their rights under *Miranda*, and they were given an opportunity to waive their rights and speak with both investigators.  As Sgt. Forrest has reported, there was no threatened or actual disciplinary action if they chose not to waive these

14

rights.  *See* Exh. 1 ¶ 39.  To illustrate the lack of compulsion, one officer, Andrew Rice, was

interviewed post-*Miranda* on March 12.  On March 27, Sgt. Forrest requested a second interview

but Rice refused, stating that he had no obligation to submit to an interview since he had not

been "ordered."  He did not suffer any disciplinary action as a result of this refusal.  Similarly, on

April 4, Officer John Henson elected not to be interviewed for the criminal investigation during a

joint IIU / MSP interview.  As a result, Cpl. Bachtell left the room and Sgt. Forrest conducted an

interview for administrative purposes only.  Henson suffered no disciplinary action for asserting

his Fifth Amendment right.

### 5.   *Morris and Morgan's Testimony in Their Own Appeals*

As a result of IIU's investigation, a number of officers were disciplined for the assault on

K.D. and the subsequent attempts at a cover-up.  This discipline included, as relevant to the

instant motion, the termination of defendants Harvey, Hinckle, Martin, Morris, and Morgan.  The

defendants had the right to appeal the termination decision, and the DPSCS' Standards of

Conduct required that the officers were provided with notice of their right to appeal their

termination.  *See* DPSCS Standards of Conduct, § VI(B)(b)(6) (noting that employee facing

charges of removal "may" submit a written appeal to the Office of Administrative Hearings with

ten days of receiving written notice of termination). *See also* Exh. 1 at ¶ 39 (noting

understanding of DPSCS investigator and Director of DPSCS Employee Relations Unit that

administrative appeals are not automatic and must be requested by the employee).   If an

employee does nothing, the termination stands.

Morris and Morgan each initiated an appeal.  Morgan's administrative hearing was held

between November 12 – 17, 2008, and Morris' hearing was conducted over nine days during

February and April 2009.  During their respective hearings, Morris and Morgan each chose to take the stand and explain, under oath, his version of events.  This testimony was not compelled in any way, and they were called to the stand by their own attorneys, not by any State actor.  As confirmed by the Glendall Adamson, who represented the DPSCS in the administrative hearings, all correctional officers, whether they were appealing their own termination or appearing as witnesses in an administrative hearing, had the right to assert their Fifth Amendment rights and refuse to testify.  *See* Exh.1 at ¶ 39.  Neither the hearing examiner nor their own attorneys ever informed either defendant that he was compelled to testify at the hearing, or suggested that he could be disciplined if he refused to do so.  And at no time during either hearing were the defendants given any assurances that testimony they gave could not be used against him in a subsequent criminal proceeding, nor does the record reflect that Morris or Morgan ever asked for such assurance.

Furthermore, the statements Morris and Morgan made during their appeal hearings were not compelled through threat of job loss. The Supreme Court has stressed that *Garrity* and its progeny apply only in situations in which "refusal . . . to waive the Fifth Amendment privilege, *standing alone and without regard to other evidence*, resulted in loss of employment or opportunity to contract with the state."  *Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976) (internal quotations omitted; emphasis added.).  Since they had already been terminated, they did not face disciplinary penalties or job loss if they elected not to testify.  As noted by the Second Circuit, *Garrity* and the other penalty cases each involve the imposition of a "sanction" or a "loss or reduction from the status quo" on an individual who exercised the right to remain silent.  *United*

*States v. Cruz*, 156 F.3d 366, 373 (2d Cir. 1998).  Here, the status quo at the time of Morris and

Morgan's appeal hearings was that RCI had already decided to terminate them.

Neither Morris nor Morgan can point to any law or policy requiring them to pursue an

appeal, much less requiring them to waive their Fifth Amendment rights and testify at any appeal

hearing.  In truth, they were each simply confronted with the classic and fully constitutional

dilemma, in which they had the choice of remaining silent and allowing the administrative record

to stand, or of taking the stand and trying to offer exculpatory evidence - thereby opening

themselves to the possibility of having their statements used against them in a later proceeding.[3]

### 6.   *Hinckle, Martin, and Hummer's Testimony in Court Proceedings*

Defendants Hinckle and Martin were both subpoenaed by Morgan's attorney to testify for

Morgan during his administrative appeal hearing.  Defendant Hummer was subpoenaed by the

government to testify in both Morgan and Hinckle's appeal hearings.  Hummer was also

subpoenaed by Hinckle's attorney to testify for the defense in Hinckle's state criminal trial.

None of the statements given during these court proceedings were compelled in a way that would

trigger *Garrity* protections.  Rather, these witnesses were in the position of any other witness

who receives a subpoena to testify.

The law is clear that a witness' testimony is not compelled simply because his appearance

was secured through a subpoena.  Rather, testimony is not compelled within the meaning of the

Fifth Amendment unless the witness is required to answer over a valid claim of his privilege.

*Murphy*, 465 U.S. at 427.  *See also, Benjamin v. of Montgomery*, 785 F.2d 959, 962 (11th Cir.

---

[3] Indeed, at least one of the appealing officers, Lanny Harris, explicitly declined to testify based on his Fifth
Amendment privilege.  *See Harris* 11/25/08 hearing transcript at 176-77 (Harris confirming, under oath, that he was
not testifying in the administrative hearing because "there remain pending potential criminal charges that may arise
out of the events that are the subject of these proceedings."). Exh. 4.

1986) (finding that testimony of subpoenaed officers, who were not the subject of disciplinary hearings and had not been directed to answer questions on pain of dismissal, would not have been coerced and could have later been used against them).

Hinckle, Martin, and Hummer, in the capacity as subpoenaed witnesses, testified under oath regarding the underlying incident and their respective roles therein.  When asked to testify, none of them attempted to invoke the Fifth Amendment, and did not express any hesitation about answering questions.  They were not told by the hearing examiner, trial judge, or by anyone else that they could be disciplined for refusing to testify, nor were they given any assurance that their testimony would not be used against them in future criminal proceedings.  These employees had the ability to exercise their Fifth Amendment rights at any time, *see* Exh. 1 at ¶39, and several employees, including defendants Harvey, Hinckle and Martin, explicitly declined to testify as witnesses in the administrative hearings of other officers.  *See* Exh 5 (Kalbflesh 1/6/09 administrative hearing at 326-27) (noting that former officers Kelly, Harvey, Hinckle, Lohr, and Harris all invoked their Fifth Amendment right not to testify after being served with subpoenas in James Kalbflesh's administrative hearing).  Given these facts, it is clear that any testimony the defendants gave in administrative hearings were voluntary, entirely uncompelled statements.

The defendants also claim in their motion that their IIU statements were disclosed "early and often" to other witnesses who later testified before the federal grand jury and are possible trial witnesses.  That claim simply is not supported by any evidence.  Sergeant Forrest has stated that he did not disclose anyone's statements to any other witnesses; Glendell Adamson, who conducted the administrative hearings for the government, said that she never disclosed any of the defendants' IIU statements to any other witnesses; and all of the witnesses who have been

18

interviewed by filter team, including witnesses who were defendants in state proceedings, have stated that they were never shown or told about other people's statements to IIU, and that the information they relayed to prosecutors was based on their own memories and recollection. *See* Exh. 1 at ¶¶ 38-39.  Furthermore, Sgt. Forrest was not involved in the state criminal cases, and the IIU report provided to MSP for the criminal investigation did not contain statements from those who did not agree to speak with MSP.

For those former officers who appealed their termination, hearings were conducted and the officer challenging the firing heard others testify and possibly be cross-examined on what they had told IIU.  As has been explained *supra*, the statements to IIU were not compelled in a way that triggers *Garrity* protections.  Furthermore, former officers Dustin Norris, Ryan Lohr and Lanny Harris, potential trial witnesses who had termination hearings, have specifically stated that their statements to the federal government were based on their own memories and not on testimony they may have heard.  *See id.* at ¶ 38.

B.  The Government Did Not Use Compelled Statements Against the Defendants

Once this Court determines which statements were compelled, the government bears the burden of proving it did not use these compelled statements against the defendants.  *Kastigar*, 406 U.S. at 460.  "Use" includes not only directly presenting such evidence to a jury or grand jury but also includes indirect uses.  Any grant of immunity must leave the government and the witness in "substantially the same position as if the witness had claimed privilege."*Id.*at 453, *cited by United States v. Harris*, 780 F. Supp. 385, 389 (N.D.W.Va. 1991). *See also, United States v. Danielson*, 325 F.3d 1054, 1072 (9th Cir. 2003) (holding that "information derived from compelled testimony may not be used in providing assistance in focusing the investigation,

deciding to initiate the prosecution, refusing to plea bargain, interpreting evidence, planning

cross-examination, and otherwise generally planning trial strategy." ) (internal citation and

quotations omitted).  There is no requirement, however, that the government prove that no

prosecutor ever saw the testimony or that the testimony had no tangential effect on the thought

processes of the prosecutors.  *See United States v. Crowson*, 828 F.2d 1427, 1431-32 (9th Cir.

1987).  All that is necessary is for the government to prove that compelled statements were not

used to "build a case" against the defendants.  *United States v. Montoya*, 45 F.3d 1286, 1292 (9th

Cir. 1995) (holding that the question is "not whether the prosecutor was aware of the contents of

the immunized testimony, but whether he used the testimony in any way to build a case against

the defendant.").

The government must prove by a preponderance of the evidence that it did not use the

statements against the defendant and that, instead, the evidence it proposes to use is derived from

sources independent of the compelled testimony.  *United States v. Harris*, 973 F.2d. 333, 337

(4th Cir. 1992) (*citing Kastigar*, 406 U.S. at 461-62).[4] Here, the government can make this

showing in two ways, either of which, standing alone, would satisfy its burden.  First, the

government can show that no member of its trial team was exposed to the alleged compelled

statements.  If no member of the trial team even saw the statements, then no member could have

used it to build the cases against the defendants.  Second, the government can break down each

alleged compelled statement to its component parts and show that there is an independent source

for each material assertion contained in the compelled statements.  It may do this either by

---

[4] Although the government's burden of showing that its evidence is derived from an independent source has been
characterized as "heavy," because of the difficulty of proving a negative, courts have imposed a "preponderance of
the evidence" burden.  The government is not required to negate all abstract possibility of taint. *Aiken v. United
States*, 30 A.3d 127, 132 (D.C. Cir. 2011) (omitting internal quotations and citations).

showing that the assertion in the compelled statements is duplicative of information in non-compelled statements or by showing that there is other evidence (e.g. statements from other witnesses or documentary evidence) which constitutes a wholly independent source for the compelled assertion.

### 1.   The Trial Team was Not Exposed to the Compelled Statements

The Civil Rights Division of the Department of Justice is involved in this prosecution because it routinely investigates allegations that law enforcement officers, employed by federal, state, or local governments, have deprived someone of his federally protected rights. *See* Exh.1 at ¶ 3-4. Because the subjects of such investigations are publically employed law enforcement officers, there is inevitably a question of whether statements they have made were compelled by threat of job termination or similar penalty. *Id.* at ¶¶ 4-5. The Criminal Section of the Civil Rights Division has thus developed expertise in ensuring that compelled statements are not used against criminal defendants. *Id.*

The primary method by which the Section ensures that compelled statements are not used against criminal defendants is by making sure that no one on the prosecution team is even exposed to such statements. *See generally id.* at ¶¶ 6-12. This is the Section's practice even though the law clearly establishes that a prosecutor's mere exposure to such a compelled statement does not constitute the use of that statement against the defendant. *See Montoya*, 45 F.3d at 1293 (holding that even if the prosecutors had been exposed to immunized testimony there was no per se rule that they withdraw from the case and emphasizing that the proper focus should be on whether the prosecutor used the immunized testimony to build a case against the defendant not on whether the prosecutor had read the testimony).

21

This is so because the Section recognizes that, if no member of the prosecution team has seen a compelled statement, then it is impossible for the team to have used the statement against the defendant. The government prevents exposure to privileged material by setting up a filter team (sometimes called a "taint" team) to review potentially privileged information and to remove any privileged statement; the team also redacts all substantive references to any such privileged statements. Exh.1 at ¶¶ 6-12.

The Ninth and Tenth Circuits have approved this approach as one method of protecting the rights of criminal defendants. *In re Grand Jury Subpoena*, 75 F.3d 446, 448 (9th Cir. 1996); *In re Grand Jury Subpoenas*, 40 F.3d 1096, 1103 (10th cir. 1994).[5] As explained in Attorney Ahmad's Declaration, this case was assigned to a filter team that reviewed all potentially privileged materials and redacted them before passing on the non-privileged portions of the file to the trial team. *See* Exh.1 at ¶¶ 13-37. This screening was over-inclusive. The team even screened out the statements defendants Morris and Morgan made during their own termination hearings, and references thereto, despite the fact that controlling case law (examined above) would have allowed the trial team to review such material. In sum, the procedures undertaken by the Section were sufficient to ensure that no member of the trial team was exposed to any of the defendants' arguably compelled statements.[6]

---

[5] The Fourth Circuit, reviewing the quashing of a federal grand jury subpoena which sought a police department's internal investigation materials, stated that it had no reason to disapprove of the *Garrity* screening process employed by the Department of Justice, but also declined to opine on its suitability in all situations. *In re Grand Jury, John Doe No. G.J. 2005-2*, 478 F.3d. 581, 587 (4th cir. 2007)

[6] Defendant Hummer signed a waiver of his *Garrity* protections on October 23, 2012, during an interview with federal investigators. His motion contains the assertion, without supporting facts, that this waiver was not knowing and voluntary. In reality, the effect of the waiver was explained fully to Hummer and he was under no compulsion to sign it; once he did, the federal investigators relied on it in good faith and have reviewed Hummer's statements.

### 2. *Independent Source*

As noted above, the Government can also meet its burden by showing that there is an independent, non-privileged source for every material assertion in the defendant's compelled statements. *Nix v. Williams*, 467 U.S. 431, 443 (1984) (ruling that the independent source doctrine allows admission of evidence that has been discovered by means wholly independent of any constitutional violation); *United States v. McHan*, 101 F.3d 1027, 1036 (4th Cir. 1996) (finding no violation of use immunity where the government had derived challenged evidence from independent sources); *See United States v. Koon*, 34 F.3d 1416, 1431 (9th Cir. 1994) (holding that Government may satisfy its burden under *Kastigar* "by showing that each matter as to which the witness will testify is derived from a source independent of the immunized testimony."). It is difficult to fully brief the issue of independent sources before this Court conclusively rules about which statements are in fact compelled. The government respectfully requests permission to submit a supplemental brief – including supplemental Declarations and charts if needed – once this Court determines which of the defendant's statements were (and were not) compelled.

The government submits with this brief, a sealed attachment containing a chart for each defendant, illustrating that various material assertions made by each defendant in alleged compelled statements were repeated in non-compelled statements. A copy of the sealed attachment will be served on defendants Morris and Harvey, along with their respective charts, as they have signed an agreement not to disseminate the materials to others. We await this Court's guidance on conditions to guide the dissemination of the sealed materials to the other defendants so that, should any of the codefendants elect to exercise their right to testify at trial,

23

there will be no possibility that they were "tainted" by exposure to their codefendants' compelled statements.  No one on the prosecution team has reviewed the sealed supplemental materials.

C.  <u>There is No Need for Discovery or an Evidentiary Hearing at this Time</u>

Defendants Hinckle, Stigile, Hummer, Martin, and Morgan have requested a *Kastigar* hearing.  However, in this case, a relatively easy procedure will protect the defendant's rights. This Court, without making credibility determinations about the testimony of a single government witness, can itself compare the defendants' arguably compelled statements with their non-compelled statements.  Upon comparison, it will be apparent that there are no material assertions (ones which could have possibly been relied upon to build a case against the defendants) that are contained *only* in the compelled statements.  If the compelled statements and the non-compelled statements are materially duplicative, then even if the government had used the compelled statements, such use would have been harmless as the information in the statements would entirely overlap with the information the government had every right to use.  If the Court is satisfied that this is so, it should dismiss the defendants' motion without granting their request for an evidentiary hearing or dismissal of the indictment.

If the Court determines that some statements were compelled and there are material assertions in those statements that are not also contained in one or more non-compelled statements, then this Court may resolve this issue by crediting Attorney Ahmad's Declaration that the prosecution team did not use those statements, or by requesting supplemental briefing on whether there are other independent sources (e.g. statement from other witnesses) for the information.  In the alternative, the Court may order an evidentiary hearing.

III.    Conclusion

In short, the government suggests that this Court first rule on the issue (briefed in Section II(A) above) of what statements made by the defendants, if any, were compelled under threat of termination.  Because the parties disagree about this issue, the government suggests that the hearing currently scheduled for July 2, 2013, be confined to its resolution.  Once the Court determines which, if any, statements are compelled, the government suggests that it compare the defendants' compelled statements to non-compelled statements (using the chart the government has provided separately under seal to assist it in this endeavor).   Based upon this comparison, the government urges that the Court deny the defendants' motions based upon a finding that all material assertions in the compelled statements are duplicative of similar assertions in non-compelled statements.

If, contrary to the government's urging, this Court identifies assertions made by the defendants which are (1) contained in a compelled statement; (2) material to the prosecution; and (3) not replicated in non-compelled statements, then the Court must use some other means to determine whether the government used such statements against the defendants.  The Court may choose to do this in one of three ways.  First, it may credit Attorney Ahmad's averment that the compelled statements were fully redacted from the material reviewed by the trial team.  Second, it may request supplemental briefing on the question whether there are any other independent sources (such as statements from other witnesses) for the assertions identified by the Court.  Finally, the Court may hold an evidentiary hearing, narrowly tailored to the question whether the government used those few statements (compelled material statements which are not wholly duplicative of non-compelled statements) to build a case against the defendants.

Respectfully submitted:

THOMAS E. PEREZ
Assistant Attorney General
Civil Rights Division

_____/s/_____
ALI AHMAD
BETSY BIFFL
Trial Attorneys
U.S. Department of Justice
Civil Rights Division, Criminal Section
601 D Street NW, Fifth Floor
Washington, DC 20579
(202) 514-3204
(202) 514-8336 FAX
Ali.Ahmad@usdoj.gov
Betsy.Biffl@usdoj.gov

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 5, 2013, a copy of the foregoing pleading was filed electronically.  Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt.  The parties may access this filing through the Court's system.

Respectfully submitted,

_____/s/_____

Ali Ahmad
Trial Attorney
U.S. Department of Justice
Civil Rights Division, Criminal Section
601 D Street, N.W., Fifth Floor
Washington, D.C.  20579
(202) 353-8466
(202) 514-8336 fax
Ali.Ahmad@usdoj.gov